IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>           Respondent,<br><br>        v.<br><br>JOHN THOMAS DAVIS,<br><br>           Appellant. | No. 85409-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — John Davis appeals from the judgment and sentence entered after a jury convicted him of one count of murder in the second degree and found by special verdict that he was armed with a firearm during the commission of that crime. He asserts violations of his right to counsel, trial by jury, present a defense, and effective assistance of counsel, but fails to establish that he is entitled to appellate relief. Accordingly, we affirm.

FACTS

In October 2018, John Davis dialed 911 and reported that he had shot a man who had threatened him with a knife, later identified as Daniel Alberto, a homeless resident of the area surrounding Davis' home. Davis was questioned over a period of more than four hours at a Seattle Police Department (SPD) building by SPD Detectives Donna Stangeland and Timothy Devore. The interview was video- and audio-recorded.

Davis told the detectives that he had stopped his car, retrieved a handgun from the trunk, and placed the handgun inside of a satchel on the front passenger side seat before he approached his home. He said that, shortly before he arrived home, he stopped his car near a man who he believed to have broken a window in his apartment; the man closed in on the passenger side of his car, threatened him, and drew a knife. Davis claimed that, in response, he drew his gun out of the satchel and fired one bullet at the man out of fear that the man was going to kill him. Over the course of the interview, Davis also made various statements regarding his ownership of different types of handguns and rifles as well as his belief about purported connections between a person's race, nationality, citizenship, or housing status and their participation in criminal conduct, drug trafficking, and drug use. The detectives also left Davis alone in the interview room on several occasions and he repeatedly spoke to himself, including an incident wherein he stated that he had "no choice" and it was either "him or me."

Stangeland initially posed more information-seeking questions to Davis. However, several hours into the interview, when the detectives returned to the interview room after viewing residential surveillance camera footage of the incident, Stangeland began to challenge Davis on his account of the incident. Nonetheless, Davis adhered to his initial narrative.

While Davis was being interviewed, Alberto was transported to emergent care and died from the gunshot wound. Davis was not informed that he was under investigation for homicide or that Alberto had passed away until the end of his interview. After hearing that information, Davis replied, "[B]ut it was self-defense."

The State charged Davis with one count of murder in the second degree, alleged to have been committed while armed with a firearm. Davis pleaded not guilty and indicated that he had shot Alberto in self-defense. Between July 2019 and December 2020, Davis repeatedly requested that the court discharge his initially appointed defense attorney due to a breakdown in communication. In December 2020, the court granted that attorney's request to withdraw on the basis that he had obtained new employment.

Later that month, another defense attorney appeared as Davis' appointed defense counsel. Six months later, in June 2021, she filed a motion to withdraw on the grounds that she was unable to follow Davis' preferred "itinerary and time frame" and her caseload rendered her unable to provide him with "one-on-one handholding representation in addition to [her] legal responsibilities to him." The court denied her request. Between January and April 2023, after a hearing in which the court found that Davis was competent to stand trial,[1] Davis filed three additional motions to discharge his trial counsel, each premised on a breakdown in communication between them, but the trial court denied all three motions.

In early April 2023, after the State sought to introduce excerpts from the interrogation video and Davis' defense attorney was unsuccessful in seeking its exclusion, both defense counsel and Davis himself expressly requested that the court admit the entire interrogation video (less some redactions proposed by the

---

[1] In July 2022, Davis' defense counsel filed a motion for a competency evaluation of Davis, which the court granted. In January 2023, a contested competency hearing was conducted during which two evaluating expert witnesses testified. The court ruled that defense counsel did not carry her burden of establishing that Davis was incompetent and adequate evidence had been proffered that he was competent to stand trial and assist in his own defense, "should he choose to do so."

State and unchallenged on appeal), which the trial court granted. Additionally, his defense attorney sought admission of testimony by Kevin Collins who would testify that Alberto had a reputation in the community for violence. The State moved to exclude that testimony, but the court denied the State's motion contingent on Davis establishing the requisite foundation and that Collins' testimony was relevant to Davis' self-defense claim.

Davis' jury trial commenced later that month and spanned seven days. The State's case in chief was presented over five of those days and included showing the jury more than three hours of the video recording of Davis' four-hour police interview. During colloquies regarding the interrogation video, Davis' defense counsel reiterated that both she and Davis wanted the entire interview tape to be played, including portions in which he was left alone in the room.

Thereafter, prior to Davis' presentation of his case, the parties conducted voir dire of Davis' victim reputation witness, Collins. After taking argument, the court excluded his testimony and ruled that defense counsel had not established that Collins had the requisite foundation to testify as to Alberto's reputation in the community for violence.[2] Defense counsel then proceeded with the rest of Davis' case in chief, and Davis exercised his right not to testify in his own defense. After the trial court issued its jury instructions and both parties presented closing argument, the jury returned a verdict that convicted Davis as charged.

Before sentencing, Davis filed another motion to discharge his appointed defense counsel, which the court again denied. The court imposed a term of

---

[2] The trial court also ruled that Davis had not established that Collins' testimony would be relevant to establishing Alberto's reputation in the community for violence.

confinement of 240 months in prison, which included a mandatory term of 60 months for the firearm enhancement consecutive to the base sentence, followed by 36 months of community custody.[3]

Davis timely appealed.

ANALYSIS

I.    Denial of Davis' Motions To Discharge and Substitute Defense Counsel

Davis contends that the trial court deprived him of the constitutional right to "conflict-free counsel" when the court denied his motions to discharge and substitute his appointed defense attorney. This is so, Davis avers, because he "and his trial attorney repeatedly sought relief from their irreconcilable conflict, which became increasingly apparent at trial" and led to a "total breakdown in their relationship." For several reasons, Davis fails to establish an entitlement to relief.

As an initial matter, our decision in *State v. Holmes* is instructive. 31 Wn. App. 2d 269, 279, 548 P.3d 570, *review denied*, 3 Wn.3d 1024 (2024). With regard to the appellate briefing therein, we stated,

> Holmes' briefing reflects fundamental misunderstandings of the law and fails to separate clearly distinct legal concepts for proper consideration. First, it is well established that "conflict-free counsel" refers to "counsel free from conflicts of interest." *State v. Reeder*, 181 Wn. App. 897, 908, 330 P.3d 786 (2014), *aff'd*, 184 Wn.2d 805, 365 P.3d 1243 (2015); *State v. Davis*, 141 Wn.2d 798, 860, 10 P.3d 977 (2000). While Holmes frames this issue in both the assignment of error and his argument in briefing as a deprivation of his "right to conflict-free counsel," he makes no attempt to show that his attorney had an actual conflict of interest. Second, "conflicts of interest" and "irreconcilable conflicts" are separate concepts that require different

---

[3] At a later restitution hearing, the trial court found that Davis was indigent, waived the victim penalty assessment and DNA collection fees that had been previously imposed on the judgment and sentence, granted the State's request to order Davis to pay $6,170 in restitution to the Crime Victims Compensation Fund, and waived the accrual of interest on the restitution.

> analyses. *United States v. Moore*, 159 F.3d 1154, 1157-58 (9th Cir. 1998); *see also In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 721-22, 16 P.3d 1 (2001) (*Stenson* II). Confoundingly, Holmes cites to *Stenson* II in his opening brief for a rule statement in which he conjoins those distinct categories into one that he then refers to as an "irreconcilable conflict of interest." Third, a "complete breakdown in communication" and an "irreconcilable conflict" are also separate grounds to move for substitution of counsel. *See State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997) (*Stenson* I). Again, Holmes blends these together and asserts that the "breakdown in communications" with his counsel "constituted an irreconcilable conflict." Then, he avers reversal is required due to the "complete breakdown in communication." Regardless of the specific basis, Holmes ultimately asserts that he was completely denied his right to the assistance of counsel under the Sixth Amendment to the United States Constitution.

*Holmes*, 31 Wn. App. 2d at 277-79 (footnotes omitted).

Davis' appellate briefing here reflects nearly identical misunderstandings of the fundamentals of this area of law. As in *Holmes*, Davis assigns error to the deprivation of the right to conflict-free counsel but does not present any analysis or argument in support of establishing an actual conflict of interest, and his issue statement and argument in his briefing erroneously conflate the concept of a conflict of interest with that of an irreconcilable conflict. Moreover, and precisely mirroring the error that we deemed confounding in *Holmes*, Davis "cites to *Stenson* II in his opening brief for a rule statement in which he conjoins those distinct categories into one that he then refers to as an "'irreconcilable conflict of interest.'" *See id.* at 278. Davis also appears to conflate the concepts of an "irreconcilable conflict" with a "breakdown in communications" and asserts that the "total breakdown in their relationship boiled over at trial" such that reversal is required. Nevertheless, as in *Holmes*, we conclude that Davis "ultimately asserts that he

was completely denied his right to the assistance of counsel under the Sixth Amendment to the United States Constitution." *Id.* at 279.

As explained *supra*, Davis attempts to support his claim of the denial of his right to assistance of counsel by asserting that he and his trial attorney's "intractable conflict warranted substitution of counsel when it became apparent that the conflict infected the proceedings and the jury's assessment of the case." However, his briefing fails to present evidence or argument in support of demonstrating that either proposition was so "apparent."

For instance, he does not identify any statements made before the jury during trial that might have indicated to jurors that such an intractable attorney-client conflict existed, and even if he had presented such statements, he does not provide us with argument to establish that those statements reasonably supported the existence of such a conflict. Furthermore, and significantly, he does not offer any evidence to demonstrate that any such statements impacted the jury's assessment of the case. Instead, he puts forward mere speculation, which is plainly insufficient to establish a deprivation of the constitutional right to counsel.

Nonetheless, even if we attempted to reach the merits of his assertion that an irreconcilable conflict existed, he has failed to properly present us with a complete analysis of this issue. "To determine whether an irreconcilable conflict exists, this court considers '(1) the extent of the conflict, (2) the adequacy of the inquiry [regarding the conflict], and (3) the timeliness of the motion [to discharge counsel].'" *Id.* at 280 (quoting *Stenson* II*, 142 Wn.2d at 724).

Although Davis' opening brief sets forth the foregoing three-factor test and presents some analysis and argument in support of establishing the first factor of that test, it does not include any analysis or argument regarding the second or third factors. Instead, Davis elected to present such analysis for the first time in his reply brief. "This court generally does not consider issues raised for the first time by reply brief, as there is no opportunity for an opposing party to respond." *State v. Lee*, 82 Wn. App. 298, 313, 917 P.2d 159 (1996), *aff'd*, 135 Wn.2d 369, 957 P.2d 741 (1998); *see also* RAP 10.3(c). We apply that same principle here. Accordingly, Davis fails to demonstrate an entitlement to appellate relief on this assignment of error.[4]

II.    Law Enforcement Interview Footage and Testimony

Davis next presents a pair of assertions involving certain statements and testimony arising from the admission at trial of the more-than-three-hour video of his interview with Stangeland. He does not prevail on either claim.

A.    Admission of Opinion Evidence Was Invited Error

Davis first contends that he was deprived of his constitutional right to trial by jury when the court admitted opinion evidence by Stangeland as captured during his recorded police interview and when it arose during her cross-examination. The State responds that the invited error doctrine precludes Davis'

---

[4] Furthermore, to the extent that Davis seeks to rely on the existence of an irreconcilable conflict at trial, this was not the basis for relief that his trial attorney presented to the trial court. Indeed, Davis indicated that his motion to discharge and substitute counsel was predicated on a breakdown in communication, a legal concept that, as discussed *supra,* is distinct from an irreconcilable conflict. Thus, Davis raises this basis for the first time on appeal and does not present the requisite analysis to establish an entitlement to our consideration of the issue. *See* RAP 2.5(a). Therefore, we decline to reach it.

assignment of error on this matter because his trial counsel specifically requested the inclusion of the entire video recording and, on cross-examination, helped create the testimony that his appellate counsel now challenges on appeal. The State is correct.

Our Supreme Court has recognized,

Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant; such testimony is unfairly prejudicial to the defendant "because it invad[es] the exclusive province of the [jury]." . . . Admitting impermissible opinion testimony regarding the defendant's guilt may be reversible error because admitting such evidence "violates [the defendant's] constitutional right to a jury trial, including the independent determination of the facts by the jury."

*State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (some alterations in original) (citations and internal quotations marks omitted) (quoting *City of Seattle v. Heatley,* 70 Wn. App. 573, 577, 854 P.2d 658 (1993); *State v. Carlin*, 40 Wn. App. 698, 701, 700 P.2d 323 (1985), *overruled in part on other grounds by Heatley,* 70 Wn. App. 573).

Under the invited error doctrine, however,

"a party who sets up an error at trial cannot claim that very action as error on appeal and receive a new trial." *State v. Momah*, 167 Wn.2d 140, 153, 217 P.3d 321 (2009). The doctrine "'precludes a criminal defendant from seeking appellate review of an error [they] helped create, *even when the alleged error involves constitutional rights*.'" *State v. Tatum*, 23 Wn. App. 2d 123, 128, 514 P.3d 763 (alteration in original) (quoting *State v. Carson*, 179 Wn. App. 961, 973, 320 P.3d 185 (2014)[, *aff'd,* 184 Wn.2d 207, 357 P.3d 1064 (2015)]), *review denied*, 200 Wn.2d 1021 (2022). "To be invited, the error must be the result of an affirmative, knowing, and voluntary act." *State v. Mercado*, 181 Wn. App. 624, 630, 326 P.3d 154 (2014). The doctrine applies to testimony that is directly elicited by the defense. *See State v. McPherson*, 111 Wn. App. 747, 764, 46 P.3d 284 (2002); *State v. Vandiver*, 21 Wn. App. 269, 273, 584 P.2d 978 (1978).

*Holmes*, 31 Wn. App. 2d at 288 (emphasis added) (some alteration in original); *see also State v. Roberts*, 32 Wn. App. 2d 571, 611, 553 P.3d 1122 (2024) (defense counsel "helped create" alleged error on appeal when witness did not testify regarding opinion until defense counsel elicited such testimony), *aff'd,* 5 Wn.3d 222, 572 P.3d 1191 (2025).

### 1.    Davis and His Defense Counsel Requested Admission of Entire Police Interview Footage

As explained *supra*, after Davis shot Alberto but before he learned that Alberto had died, Davis was taken to an SPD interview room and interviewed by Stangeland and Devore.  Davis was kept in the room for approximately four-and-a-half hours, with some extended periods of time where he was left alone.  During this interview, Stangeland made various statements to Davis, including that she believed that he "snapped," his "anger played a part in this," he left out details that would make him "look bad," he pulled the trigger and shot Alberto because of a "little flash of anger," and said, "I think that you probably did pick up the gun a little sooner than what you kind of remembered at first."  In response, Davis did not deny that he shot Alberto but repeatedly said that he did so because he feared for his life.

During pretrial proceedings, the parties and the court discussed the interview footage on multiple occasions.  After the State initially sought to admit the footage with certain redactions and defense counsel's attempt to exclude the footage in its entirety was unsuccessful, the following exchange occurred:

[DEFENSE COUNSEL:] The other thing is the [d]efense had asked that if the State is going to be redacting some of the interview transcript,[5] that then, under the [r]ule of [c]ompleteness, those portions that are relevant the [d]efense would like to have included. I don't know where the [c]ourt stands on that or where the State stands.

[TRIAL COURT]: Well, I guess I don't know what you're asking.

[DEFENSE COUNSEL]: *I'm asking that the entire interview be played, which is about four hours, if not a little longer*.

(Emphasis added.)

Later on, during the fourth day of trial, Davis' counsel reiterated that "what the [d]efense had requested [wa]s that the entire interrogation tape be played." After a nearly three-hour excerpt of the video recording was played for the jury, the trial court indicated that defense counsel in a side bar "said they had requested certain portions of the interview be played and asserted that those portions were not played."

The next day, the trial court engaged in a colloquy on this issue and, in discussing a one-hour-and-10-minute excerpt from the interview recording that contained only 22 lines of dialogue, the following exchange occurred:

[TRIAL COURT:] So, [defense counsel], you want to play the whole hour and something?

[DEFENSE COUNSEL]: *This is what Mr. Davis is insisting upon, Your Honor*.  My suggestion was that we—

[TRIAL COURT]: Cut out the gaps?

[DEFENSE COUNSEL]: Cut out the gaps and inform the jury there's nothing going on and we're going to be moving along, which may then help the State not have to spend more time doing this.

---

[5] Illustrative transcripts of the interview were admitted for pretrial and trial purposes.

*I don't have a problem with all of that going to the jury*, but I understand that [the prosecutor], when I mentioned it to him this morning, didn't feel comfortable.

[TRIAL COURT]: Yeah. I mean, I think that either the [d]efense wants the whole thing played or they don't, and it sounds like the [d]efense's position—well, *it sounds like Mr. Davis's position is he wants the whole thing played.*

*THE DEFENDANT: I do.*

[DEFENSE COUNSEL]: Correct.

[TRIAL COURT]: So that's what we'll do.

[DEFENSE COUNSEL]: Thank you, Your Honor.

(Emphasis added.) The excerpt in question was played for the jury on the next day of trial.

On appeal, Davis does not dispute that Stangeland's challenged statements constituted part of the hours-long interview recording excerpts played for the jury. He also does not meaningfully challenge that both he and his defense counsel sought the admission of the entire interview footage, which included those challenged statements.[6]

Therefore, even assuming that Stangeland's statements constituted improper opinion evidence, it is apparent that Davis invited any resulting error arising from those statements when he specifically sought and obtained the admission of the entirety of the interview recording at trial. Consequently, because any potential error relating to his right to trial by jury that would have resulted from

---

[6] In a footnote in Davis' reply brief, his appellate defense counsel cites to a portion of the pretrial verbatim report of proceedings for the proposition that "it is clear from context that defense [wa]s arguing for the inclusion of the last hour or so of video, when Mr. Davis [wa]s largely by himself in the interrogation room." However, the record citations Davis offers belie his characterization.

those statements was plainly invited by both Davis and his trial counsel, he cannot now assign error to the comments that formed part of the evidence that he expressly sought to present to the jury at trial. As such, his assertion fails.

> 2. Defense Counsel Elicited Stangeland's Challenged Testimony on Cross-Examination

On the fifth day of trial, following the jury's viewing of each of the interrogation video excerpts, Davis' trial counsel cross-examined Stangeland on the strategy underlying her interrogation of Davis, during which the following exchange occurred:

> [DEFENSE COUNSEL:] So when you came back into the room and spoke with Mr. Davis after viewing the video, *you had a different approach, gentle but a different approach, trying to convince him that maybe this happened because he was angry*?
>
> [STANGELAND:] I wasn't trying to convince him of anything, ma'am. I was trying to get him to be forthcoming about what he had been feeling because *I did not believe that he was being truthful with me because of some of the things he had said*.
>
> . . . .
>
> [DEFENSE COUNSEL:] And *you also said that you wanted to know the truth from him*; correct?
>
> [STANGELAND:] *Yes. Absolutely*.
>
> . . . .
>
> [DEFENSE COUNSEL:] This is based, though, on the fact that you're trying to find out, as you said to Mr. Davis, what happened; correct?
>
> [STANGELAND:] *Yes. I want the truth from him.*
>
> [DEFENSE COUNSEL:] And in spite of the fact that what he told you throughout the entire interview, interrogation, was the exact same thing that he told you when he called 9-1-1; correct?

[STANGELAND:] Yes.

[DEFENSE COUNSEL:] The exact same thing that he, in a summarized fashion, told the officers who saw him at the scene; correct?

[STANGELAND:] Yes, as far as I know.

(Emphasis added.) Then, Davis' defense counsel inquired into the impact of the residential surveillance camera recording of the incident that had been provided to SPD as follows:

[DEFENSE COUNSEL:] Okay. *And so based on viewing that video with your colleagues, that was one of the determining factors, was it not, that Mr. Davis would be charged* versus treated as a self-defense in this case?

. . . .[7]

[STANGELAND:] So I don't make a decision about him being charged; I make a decision about whether or not he's going to being booked; but *the fact that the events that he said he was positive about that were completely untrue*, saying that Mr. Alberto had walked quickly from the front driver's window to the front passenger window when he had not—he had walked away, walked to the back, and then left and then come [sic] back—he just—*he did not give me the truth about what happened. So yeah, that was a huge factor with me wondering why he was not giving me accurate information*.

(Emphasis added.)

Even assuming, without so deciding, that Stangeland's testimony was improper, Davis' trial counsel invited any error now claimed based on these statements. The record reflects that the challenged testimony was elicited through questions posed by his trial counsel on cross-examination and, therefore, his attorney played a significant role in creating the error now presented on appeal.

---

[7] An objection on relevance grounds was overruled.

- 14 -

For instance, although Davis now asserts that Stangeland improperly testified as to her belief in his truthfulness, his trial counsel's questioning meaningfully contributed to that very testimony; defense counsel asked Stangeland about her change of tactics following a break in the interview, Stangeland testified in response that she did so because she believed that Davis was being untruthful, and defense counsel responded by prompting her with further examination about Stangeland's belief in his untruthfulness. Similarly, when defense counsel asked Stangeland about how her viewing of the surveillance camera footage of the shooting changed her subsequent questioning of Davis, Stangeland responded by testifying that she came to believe that Davis was not giving her accurate information after watching the surveillance footage. Because Davis' trial counsel helped create the allegedly improper opinion testimony at trial, he cannot now assign error to such evidence on appeal. Therefore, this assignment of error fails.

B.      Decision To Seek Admission of Interview Footage Was Tactical

Davis next contends that he was deprived of his right to effective assistance of counsel when his trial attorney did not object to certain statements in the interrogation video or to Stangeland's testimony in response to defense cross-examination on the interrogation video. His contention fails.

In order to prevail on a claim of ineffective assistance of counsel (IAC), an appellant must establish both that their attorney's performance was deficient and that such performance prejudiced them. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). In a review of an attorney's performance, there is a strong presumption that counsel was effective. *State v. Crow*, 8 Wn. App. 2d 480,

507, 438 P.3d 541 (2019). Performance is deficient if counsel's conduct falls "'below an objective standard of reasonableness.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). The question is not "'whether counsel's choices were strategic, but whether they were reasonable.'" *Grier*, 171 Wn.2d at 34 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)).

Here, as analyzed *supra*, after defense counsel's attempt to exclude the entire video was denied before trial, both Davis and his trial counsel repeatedly indicated to the court their request to present the jury with most of the interview footage. Thereafter, in Davis' opening statement at trial, his defense counsel explicitly stated that the evidence would show that

> Davis was in the interrogation with Detective Stangeland and Detective D[e]vore and he talked with them for hours and hours, never denying that he was involved, never denying that he shot Mr. Alberto, and never denying that he was anything other than scared to death.

Then, at the close of trial, his defense counsel argued, "Mr. Davis tried for three hours of an interrogation to tell Stangeland that, 'What you're telling me happened didn't happen'" and, "[E]very single challenge that Detective Stangeland gave to what Mr. Davis was saying, he denied. Why? Because that was not the way he saw it." Continuing to emphasize the length of the video footage, she argued, "And so it's long, I understand that; and it's boring at times, I understand that; but there

is a lot in that video that you will see when you take a look at it that includes the information that you need to be aware of and we're asking that you be aware of."

We can conceive of a legitimate tactic underlying Davis' trial counsel's performance. As a general matter, a reasonable attorney would recognize that many of the statements that Davis made during the interrogation would be admissible at trial as statements against his interest, including as against his claim of self-defense. *See* ER 801(d)(2); *State v. Grimes*, 92 Wn. App. 973, 981, 966 P.2d 394 (1998) (defendant's statements to detectives during interrogation not objectionable hearsay). Given that and after reviewing the interview recording, counsel could reasonably elect to pursue a strategy to admit a significant portion of the video recording in order to give context to those statements and demonstrate the consistency with which Davis adhered to his theory of self-defense even while being interrogated by Stangeland's shifting tactics over the course of four hours.

Furthermore, the record establishes that this was precisely the strategy defense counsel employed in support of Davis' self-defense theory at trial, as evidenced by her opening statement, cross-examination of Stangeland, and closing argument on his behalf. Davis contends that his trial counsel's strategy of "focusing on the detective's interrogation method was not reasonable because the detective's questioning did not elicit admissions of guilt from Mr. Davis; he did not deviate from his initial claims because of the interrogation method." Notably, however, this contention serves only to highlight the *reasonableness* of his trial counsel's chosen tactic; despite Stangeland's method or questioning, Davis did

- 17 -

not deviate from his initial narrative.[8]  On this record, Davis does not establish that his trial defense attorney's performance was deficient, and his IAC claim fails.

III.    Exclusion of Victim Reputation Testimony

Davis also asserts that the trial court deprived him of the right to present a defense when it excluded Collins from testifying on the basis that he did not have the requisite foundation to testify as to Alberto's reputation in the community for violence.  The trial court did not err in so ruling.

We have stated,

> The Sixth Amendment to the United States Constitution and article I, section 22 of our state constitution guarantee an accused person "(1) the right to present testimony in one's defense; and (2) the right to confront and cross-examine adverse witnesses." *State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983) (citation omitted).  The right "to call witnesses in one's own behalf ha[s] long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).  In "plain terms," the Supreme Court described the defendant's right to present such testimony as "the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).  Rather than creating a new right, however, the Court explained this right is rooted in due process. *Id.*
> The right to compel and present witnesses is far from absolute; neither irrelevant nor inadmissible evidence is covered by the "right to present a defense." *State v. Strizheus*, 163 Wn. App. 820, 830, 262 P.3d 100 (2011). . . .  So long as the "defendant has an opportunity to present his theory of the case, the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights." *State v. Ritchie*, 24 Wn. App. 2d. 618, 635, 520 P.3d 1105 (2022).

*State v. Broussard*, 25 Wn. App. 2d 781, 785-86, 525 P.3d 615 (2023) (some alteration in original).

---

[8] Additionally, although not dispositive of whether he was deprived of the right to effective assistance of counsel, we reiterate that seeking to admit the entire interview recording was a strategy specifically requested by Davis *himself* at trial.

Davis' challenge on appeal is, in essence, a challenge to an evidentiary decision by the trial court. In such a circumstance,

> [t]his court applies a two-step standard of review when considering whether an evidentiary decision violated a defendant's due process "right to present a defense." *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). First, we review the evidentiary decision under an abuse of discretion standard. [*State v.*] *Jennings*, 199 Wn.2d [53,] 58[, 502 P.3d 1255 (2022)]. When the evidentiary ruling constitutes an abuse of discretion that results in prejudice, the analysis ends here. *Id.* at 59. However, if the ruling was either within the trial court's discretion or an abuse of discretion but harmless, the review proceeds to step two, reaching the constitutional question. *Id.*
> Second, the court "consider[s] de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense." *Id.* at 58. As our Supreme Court explained, "At its core, the constitutional right to present a defense ensures the defendant has an opportunity to defend against the State's accusations." *Id.* at 66. Because this right is not absolute, "the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted." *Arndt*, 194 Wn.2d at 812.

*Id.* at 786-87 (some alteration in original).

A.    Trial Court Properly Excluded Collins' Testimony for Lack of Foundation

We first consider whether the trial court abused its discretion when it excluded Collins' testimony. It did not.

When a claim of self-defense is raised, the defendant may introduce evidence concerning the victim's reputation for violence. *State v. Alexander*, 52 Wn. App. 897, 900, 765 P.2d 321 (1988); *see also* ER 404(a)(2). However,

> [i]n order to offer reputation testimony, a witness must lay a foundation establishing that the subject's reputation is based on perceptions in the community. ER 608(a). A witness's personal opinion is not sufficient to lay a foundation. *State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993); ER 608 cmt. Our Supreme Court has held that a valid community must be "'neutral enough [and] generalized enough to be classed as a community.'" *State v. Lord*,

117 Wn.2d 829, 874, 822 P.2d 177 (1991) (quoting *Parker v. State*, 458 So. 2d 750, 753-54 (Fla. 1984), *cert. denied*, 470 U.S. 1088 (1985)), *cert. denied*, 506 U.S. 856 (1992).

*State v. Thach*, 126 Wn. App. 297, 315, 106 P.3d 782 (2005) (some alterations in original), *overruled on other grounds by State v. Case*, 13 Wn. App. 2d 657, 466 P.3d 799 (2020).

As explained *supra*, Davis' defense counsel sought to call Collins as a witness to testify that Alberto had a reputation in the community for violence. Collins was subject to voir dire prior to Davis' presentation of his case in chief at trial. As the proponent of the testimony in question, defense counsel opened the voir dire and, in response to her questioning, Collins stated that he visited the Fremont Fellowship Hall, a local gathering hall for those recovering from drug and alcohol use, almost daily for over 30 years. He asserted that he was familiar with Alberto from seeing him around the Fellowship Hall and had been involved in "not pleasant experiences" with Alberto for over "[m]aybe three years," including seeing him flee from police, conduct himself in a manner that was disruptive and aggressive toward others, engage in "fake boxing with the footwork and stuff," throw one of Collins' flowerpots, and engage in "actual physical altercations" with others, such as "throwing punches" and kicks. Collins nevertheless added that when Alberto came to the Fellowship Hall, he was welcomed, and Collins had never seen him with a weapon, including a knife.

The State began its voir dire as follows:

[DEPUTY PROSECUTOR:] I just have a few questions for you.

[COLLINS:] Yes.

- 20 -

[DEPUTY PROSECUTOR:] *And that is, ultimately do you know what Mr. Alberto's reputation was in the community around the Fellowship Hall?*

[COLLINS:] *No, I let him formulate his own.* Just from my observation, you know, I made my made up [sic] my mind about what I should think of this person. You know, I try not to prejudge. You never can tell if someone's gonna stick and get sober or whatever the circumstance.

[DEPUTY PROSECUTOR:] Okay. So all of the—*as I'm understanding, again, you it's not like you were talking to people within the community about Mr. Alberto?*

[COLLINS:] *Not primarily;* but after he started getting that reputation, other people had kind of reaffirmed my observations, you know, that, yeah. You know, we'd say, "God, I hope that guy doesn't come in." You know.

[DEPUTY PROSECUTOR:] *And as far as his—again, are you basing your judgments about Mr. Alberto based on your own experiences or based on his reputation within the community?*

[COLLINS:] *My observed experience and evidence.*

(Emphasis added.) The State then asked Collins about the manner of Alberto's reputation in the community:

[DEPUTY PROSECUTOR:] Okay. Do you know what his reputation in the community was?

[COLLINS:] Well, I knew his place in the community was pretty much a drug-user. Kind of, you know, an opportunist, you know.

[DEPUTY PROSECUTOR:] Okay.

[COLLINS:] And, you know, just kind of a violent guy.

[DEPUTY PROSECUTOR:] How many people do you think would have been—well, I guess, what would you say is the community around the Fellowship Hall there?

[COLLINS:] The ones that are in sobriety? Or just both?

[DEPUTY PROSECUTOR:] Yes.

[COLLINS:] The cast of characters that would appear on a regular basis would probably be about like three dozen people that you can pretty much count on seeing there once every couple of days or something. You know.

[DEPUTY PROSECUTOR:] Okay. And, I guess, what did, from your understanding, did other people think of Mr. Alberto?

[COLLINS:] Well, it all depends. I mean, I suppose if you're using drugs and stuff like that, he'd probably be your friend.
If you're trying to stay sober and also maintain a place where other new people could come in, you know, he'd be kind of viewed as an aggressor or, you know, somebody that the neighborhood would probably be better if he found another neighborhood or place.

The State then asked Collins, "How often do you think you would talk to other people about Mr. Alberto?" To which Collins responded, "Not often. I mean, we have better things to talk about."

On redirect with Davis' counsel, the following exchange occurred:

[DEFENSE COUNSEL:] So when you described Mr. Alberto's behavior in the Fellowship Hall, were there others there who observed that also?

[COLLINS:] Oh, many.

[DEFENSE COUNSEL:] Okay. And as a result of those observances, is that why he was taken out of the meetings?

[COLLINS:] Well, he took himself out because there was no violence allowed in the hall, no hitting and stuff like that. Yeah. And then, you know, stealing, like, coffee, sugar, creamer and stuff. You know, I don't know what the hell he was doing with it.

[DEFENSE COUNSEL:] So when that occurred, was there a discussion among the Fellowship Hall people who were there, the Fremont Fellowship Hall people who were there, about Mr. Alberto's behavior?

[COLLINS:] *Not specifically about Mr. Alberto. . . .*

- 22 -

. . . .

[DEFENSE COUNSEL:] So was Mr. Alberto welcomed into the community there at the Fremont Fellowship Hall?

[COLLINS:] Naturally.

[DEFENSE COUNSEL:] But was he welcomed when he became agitated and angry?

[COLLINS:] By degrees, as it got worse, you know, the less welcome, you know, and responsive we'd be towards him. . . .

. . . .

[DEFENSE COUNSEL:] So that being the case, was he—and I know I asked you this before, but I may have used the wrong word. Was there a time when he was no longer welcome there until his behavior changed?
Aside from the—

[COLLINS:] Yeah. I'm trying to think if we had moved to have him actually—we had a thing called the "86 list," and, again, I'm trying to think if he ever eeked his way onto that list. I can't recall honestly.

(Emphasis added.)

The court then excluded Collins' testimony based on its determination that Davis' trial counsel did not lay a proper foundation for Collins to provide testimony regarding Alberto's reputation in the community for violence. This was so, the court concluded, because Collins' expressly indicated that he did not know Alberto's reputation and because, although some of Collins' proposed testimony could be construed as Alberto having a reputation for violence, the foundation for Collins' testimony to that effect was his personal experience with Alberto, not Alberto's particular reputation in that community.[9]

---

[9] The trial court also excluded Collins' testimony on the basis that it was not relevant to the purpose for which it was offered. Given our resolution of this matter, we need not address this alternative basis of the trial court's exclusionary ruling.

- 23 -

The trial court did not abuse its discretion in so ruling. In his voir dire, Collins expressly indicated that he did not know Alberto's reputation in the community, he did not speak to others about Alberto's reputation therein, and to the extent that Alberto had a reputation *with Collins*, the conduct giving rise to such a reputation was predicated on Collins' personal interactions with Alberto.[10] Therefore, the court did not err when it determined that Davis did not establish that Collins had the requisite foundation from which to offer testimony as to Alberto's reputation in the community and, accordingly, did not abuse its discretion when it ruled to exclude Collins' testimony as offered for that purpose.

B.      Exclusion of Collins' Testimony Did Not Deprive Davis of His Constitutional Right To Present a Defense

We next consider de novo whether the trial court's ruling to exclude Collins' testimony deprived Davis of his constitutional right to present a defense. It did not.

In his appellate briefing, Davis described the impact that the exclusion of Collins' testimony had on his trial as follows:

> Mr. Alberto's reputation as "aggressive" and "violent" was highly relevant to the jury's objective assessment of whether Mr. Davis' subjective perception of Mr. Alberto's threat was reasonable. It also supported Mr. Davis' claim that Mr. Alberto was the aggressor.

Put another way, Davis contends that Collins' testimony would have supported his self-defense claim to the extent that it suggested that Alberto was the aggressor and Davis' perception of the danger that Alberto posed was more credible.

---

[10] To the extent that Davis seeks to rely on Collins' observation that other members in the community witnessed the same incidents involving Alberto as those observed by Collins, this again regards a specific incident involving Alberto, not a reputation in the community, and likewise does not establish trial court error when it ruled that Davis failed to lay a proper foundation for Collins' testimony.

This assertion fails. As explained *supra*, "[s]o long as the 'defendant has an opportunity to present [their] theory of the case, the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights.'" *Broussard*, 25 Wn. App. 2d at 786 (quoting *Ritchie*, 24 Wn. App. 2d at 635). Notably, Davis does not present us with argument or analysis in support of the proposition that the exclusion of Collins' testimony denied him the opportunity to present his theory of his defense. Moreover, even if he had presented such briefing, the record in this matter is to the contrary. As detailed *supra*, the jury viewed the extensive hours-long video footage of his police interview, as requested by both Davis and his trial counsel, that contained his repeated and steadfast statements as to his belief that he shot Alberto out of a fear that Alberto was going to kill him. Moreover, his defense counsel relied on that footage in opening statement and closing argument in support of presenting his self-defense theory to the jury. As such, the record reflects that Davis was not denied an opportunity to present his self-defense theory, and Davis' assertion on this issue fails.[11]

Affirmed.

WE CONCUR:

_____

Feldman, J.

_____

Birk, J.

___

[11] Although Davis initially assigned error to the sentencing court's restitution determination, we note that his reply brief appears to concede that this assignment of error is no longer viable in light of our Supreme Court's affirmance of our decision in *State v. Morgan*, 28 Wn. App. 2d 701, 538 P.3d 648 (2023), *aff'd*, 4 Wn.3d 261, 562 P.3d 360 (2025). We accept Davis' concession.